UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED UNION OF ROOFERS,
WATERPROOFERS, AND ALLIED WORKERS,
LOCAL NO. 210, AFL-CIO,
and

JACK LEE and GEOFFREY MCCREARY,
in their capacities as TRUSTEES of the
UNITED UNION OF ROOFERS, WATERPROOFERS,
AND ALLIED WORKERS, LOCAL UNION NO. 210
MONEY PURCHASE PENSION PLAN and
ROOFERS LOCAL UNION NO. 210 JOINT
HEALTH & WELFARE PROGRAM,

Plaintiffs,                    07-CV-224-HKS

-vs-

A. W. FARRELL & SON, INC.,
ROOF CRAFT SYSTEMS, INC.,
JOHN W. FARRELL, a/k/a Bill Farrell, and
JOHN T. FARRELL,

Defendants.

APPEARANCES:   LIPSITZ GREEN SCIME CAMBRIA LLP (ROBERT L. BOREANAZ,
               ESQ., and ANDREW O. MILLER, ESQ., of Counsel), Buffalo, New
               York, Attorneys for Plaintiffs

               PHILLIPS LYTLE LLP (PAUL MORRISON TAYLOR, ESQ., and
               GARY F. KOTASKA, ESQ., of Counsel), Buffalo, New York,
               Attorneys for Defendants.

## MEMORANDUM OF DECISION

Plaintiffs United Union of Roofers, Waterproofers, and Allied Workers, Local No.
210, AFL-CIO ("Local 210"), and Jack Lee and Geoffrey McCreary, Trustees of Local 210's
Money Purchase Pension Plan and Joint Health & Welfare Program (the "Funds"), brought



UNITED STATES DISTRICT COURT
FILED
SEP 10, 2012
W.D. OF N.Y.

this action against corporate defendants A.W. Farrell & Son, Inc. ("AWF") and Roof Craft Systems, Inc. ("RCS"), and against individual defendants John W. ("Bill") Farrell and John T. ("John") Farrell, seeking declaratory, injunctive, and other equitable relief pursuant to Sections 502(a)(3) and 515 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132(a)(3), 1145, and Section 301 of the Labor-Management Relations Act of 1947, 29 U.S.C. § 185 ("LMRA" or the "Taft-Hartley Act").

Plaintiffs allege that Bill and John Farrell established a branch of RCS in Erie, Pennsylvania, as a non-union shop in order to avoid their obligations to contribute to the Funds and pay union dues based on hours worked by RCS employees within the territorial jurisdiction of the Collective Bargaining Agreement ("CBA") between Local 210 and signatory employers. Plaintiffs contend that "Roof Craft is an alter ego and/or shares a single-employer status" with AWF, making RCS liable for the same contractual obligations as AWF, Dkt. #18 (Amended Complaint), ¶ 29, and that Bill and John Farrell should be found "personally, jointly, and individually liable" for the avoided contributions "due to their intentionally fraudulent acts …." *Id.* at ¶ 39.

The parties consented to have the undersigned conduct all proceedings in this case, including trial and entry of final judgment, in accordance with 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure, and a non-jury trial was held before this Court over the course of eleven days in November and December 2011. The following

constitutes the Court's findings of fact and conclusions of law, in accordance with Fed. R. Civ. P. 52.[1]

## FINDINGS OF FACT

### I.   The Parties

1.   Plaintiff Local 210 represents roofers working in Pennsylvania and New York State.

2.   Plaintiffs Jack Lee and Geoffrey McCreary are trustees of the Funds.

3.   The Funds are employee benefit plans within the meaning of Section 3(3) of ERISA, 29 U.S.C. § 1002(3). The Funds are jointly-administered labor-management trust funds established and maintained pursuant to the terms of various CBAs between Local 210 and signatory employers, who are required to make contributions to the Funds on behalf of employees engaged in work covered by the CBA.[2]

4.   Defendant AWF is a commercial roofing business with locations in Dunkirk, Rochester, and Elmira, New York; Erie, Pennsylvania; Cleveland, Ohio; and Omaha, Nebraska. Its corporate headquarters is located at 3761 East Lake Road, Dunkirk, New

---

[1]Rule 52 states in relevant part:

In an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of evidence or may appear in an opinion or a memorandum of decision filed by the court. Judgment must be entered under Rule 58.

Fed. R. Civ. P. 52(a). While "punctilious detail" is not required, *In re Mazzeo*, 167 F.3d 139, 142 (2d Cir.1999) (internal quotation marks omitted), the court must set forth its findings and conclusions sufficiently to permit meaningful appellate review. *See, e.g.*, *United States v. Sasso*, 215 F.3d 283, 292 (2d Cir. 2000).

[2]Copies of the CBAs in effect during the events described herein as pertinent to this action have been submitted to the record as Joint Exhibits 88-93.

York. AWF was incorporated in the mid 1960's, and became a union contractor around the same time. At all times relevant to this action, AWF was a member of the Erie Construction Council of Erie Pa., signatory to the CBA with Local 210.

5.     Defendant RCS is a non-union commercial roofing company which was acquired by Cathy and Mark Farrell (defendant Bill Farrell's children) from a third party in February of 1991. At that time, RCS had a single location in Cleveland (Garfield Heights), Ohio. Subsequently, RCS branches were opened in Columbus, Ohio (between 1995-97); Dunkirk, New York (1999); Loudon, Tennessee (2000); Piedmont, Alabama (between 2003-04); and Erie, Pennsylvania (2004). Tr. 1729-30. The address for RCS' corporate headquarters is 3761 East Lake Road, Dunkirk, New York, the same address as AWF. RCS is not a member of the Erie Construction Council, and is not otherwise a signatory to the CBA with Local 210.

6     Defendant Bill Farrell is the 100% owner of AWF. He started in the roofing business in the 1940's with his father, Albert. Since that time, the companies owned by Bill Farrell and his children John, Cathy, Mark, Robert, and Susan have developed into a national roofing business, comprised of several companies with over fifty locations across the United States.

7.     Defendant John Farrell is Bill Farrell's son. John is a Vice-President of AWF, and managed AWF's branch located in Erie, Pennsylvania for approximately 20 years.

## II. The Farrell Family Companies

8.   Joint Exhibit 1 is an "Organizational Chart – Ownership Grid" prepared by defendants depicting the names, locations, and ownership interests of the companies owned by Bill Farrell and/or his children, as follows:

- AWF
  Dunkirk, New York
  Ownership:  Bill Farrell 100%

- Jameson Roofing Co., Inc.
  Buffalo, New York
  Wholly owned subsidiary of AWF

- Northwestern Roofing Co., Inc.
  Meadville, Pennsylvania
  Wholly owned subsidiary of AWF

- RCS
  Headquartered in Dunkirk, New York, with Locations in Ohio,
  Tennessee, Alabama, and Erie, Pennsylvania
  Ownership:  Cathy Farrell 51%
              Mark Farrell 49%

- Team Roofing, Inc. (formerly, Carolina Roofing, Inc.)
  Locations in North Carolina and South Carolina
  Ownership:  Robert Farrell 50%
              John Farrell 50%

- Roofers Edge, Inc.
  Locations in Virginia and Pennsylvania
  Ownership:  Bill Farrell 100%

- RoofUSA LLC
  Locations in Arizona, California, New Mexico, Texas, Oregon,
  Washington, Arkansas, and Florida
  Ownership:  Bill Farrell 20%
              Farrell Children 16% Each

- Rooforete LLC
  Locations in North Carolina and South Carolina
  Ownership:  Robert Farrell 50%

John Farrell 50%

- F-Five LLC
  Holding Company of Classic Roofing LLC
  Ownership: Mark Farrell 80%
  John Farrell 10%

- Classic Roofing LLC
  Phoenix, Arizona
  Wholly owned subsidiary of F-Five LLC

- Progressive Services, Inc.
  Locations in Arizona and Nevada
  Ownership: Bill Farrell 100%

- Farrell Roofing Properties LLC
  North Carolina
  Ownership: Robert Farrell 100%

- Roofguard Insurance Company Ltd. (Insurance "Captive")
  Hamilton, Bermuda
  Ownership: Bill Farrell 20%
  Farrell Children Each 16%

These companies are referred to collectively herein as the "Farrell Family Companies" or the "Farrell Companies."

9. At the trial, AWF's Chief Financial Officer ("CFO") John Bauer testified about the organizational structure of the Farrell Family Companies, grouped for financial and administrative purposes into the "Eastern" and "Western" Companies. The Eastern Companies include AWF, RCS, Jamison Roofing, Team Roofing, Northwestern Roofing, Roofer's Edge, Roof Crete, and Roof USA. The Western Companies include Progressive Services, Classic Roofing, and Farrell Five IT LLC, a family trust. Tr. 1462–63.[3]

[3]Numerical references preceded by "Tr." are to pages of the eleven-volume Trial Transcript, consecutively numbered from 1-1778, submitted on the record as Dkt. Nos. 64-75.

10.     As CFO during the relevant time period, Mr. Bauer oversaw the banking, insurance, and accounting functions of the Eastern Companies, with administrative support from employees at AWF headquarters in Dunkirk. The costs and expenses associated with Mr. Bauer's services are allocated among the companies on a pro rata basis. Tr. 1477-79.

11.     Other administrative functions provided by AWF-Dunkirk for the Eastern Companies include human resource services, payroll, and administration of employee benefit plans. Tr. 1510-13.

12.     Progressive Services maintains 401(k) and life insurance plans, which are available to union and non-union employees of all Farrell Family Companies. Tr. 1515; 1523.

13.     Mr. Bauer also serves on a joint insurance committee to oversee common purchase and administration of liability, workers' compensation, and other types of insurance covering all of the Farrell Family Companies. Tr. 1525.

14.     AWF maintains several accounts at M&T Bank to handle payroll, purchases, accounts receivable, accounts payable, loans, extensions of credit, interest-bearing investments, and other financial matters on behalf of all of the Farrell Family Companies. Bill Farrell and John Bauer are the only two individuals who have discussions with M&T Bank regarding the banking relationship. Tr. 1529-30.

15.     To allocate common costs, the Farrell Companies utilize a software program called "Timberline," which is specifically designed to provide accounting and project management for large construction contractors. Tr. 1684. John Bauer testified that the

-7-

purpose in using Timberline is to enhance efficiency for the inter-company transactions between the Farrell Companies. Tr. 1485.

16.     Progressive Roofing purchased the Timberline software for approximately $400,000, and pays the annual usage fee. These costs are allocated among those Farrell Companies using the software under license with Timberline. Tr. at 1683-88.

17.     AWF uses the Timberline system to allocate overhead costs among the Farrell Companies on a monthly basis as accurately as possible in an effort to achieve "economies of scale," enabling the provision of administrative services on a larger scale with lower average cost per company. Tr. 1688-90.

### A.     AWF–Erie

18.     AWF has operated a union shop in Erie PA for many years, located at 1910 Schaper Avenue. John Farrell was the branch manager at AWF-Erie from approximately 1990 until June 2011. Tr. 1405, 1409.

19.     Approximately 50%–75% of the roofing work performed by AWF-Erie involved built-up roofing ("BUR"), which is a multi-layered application of insulation, fiberboard, gravel, asphalt, and other materials. Defendants' Exhibits A and B represent "core test cut" exemplary samples of the materials and construction process involved with BUR roofing applications. Tr. 133-34. The remainder of AWF-Erie's work involves single-ply EPDM ("ethylene propylene diene monomer") or TPO ("thermoplastic polyolefin") roofing applications. Tr. 1411. Defendants' Exhibit C is a sample of a TPO roof, and Defendants' Exhibit D is a sample of an EPDM roof. Tr. 134-36.

20.    Built-up roofing work requires specialized equipment, including tar kettles, spray equipment, hot butters, chain mops, felt layers, mop carts, and "dragon wagons." Tr. at 1413.

21.    As much as 75% of the work done by AWF-Erie is "prevailing wage" work – *i.e.*, publicly-financed construction projects subject to wages set by state or federal labor law standards.  Tr. at 1414.

22.    One of John Farrell's primary duties as branch manager was to keep abreast of the competitors for commercial roofing work in the relatively small Erie PA market. During the relevant time period, there was fairly intense competitive bidding between union companies, (such as AWF, McCreary Roofing, and Jamestown Roofing) and non-union companies (such as Alex Roofing, Centi-Mark, and Barnhart Construction).  Tr. 164-65; 1308-09.

23.    John Farrell testified that, when he first became manager of AWF-Erie in the early 1990's, Barnhart Construction was AWF's primary non-union competitor in the Erie commercial roofing market.  Barnhart's roofing work eventually tapered off, and Barnhart closed its roofing division in 2004, leaving Alex Roofing as the premiere non-union commercial roofing contractor in Erie.  Tr.1310-12; 591.

24.    Prior to closing their roofing division, the owners of Barnhart Construction met with Bill and John Farrell to discuss whether AWF had any interest in purchasing Barnhart's business and/or equipment.  Tr. 1207-08; 1210.  After meeting with the Barnharts two or three times, John Farrell informed them that he was not interested in buying their business.  Tr. 1421.

## B. RCS—Erie

25.     John Farrell testified that it was during his initial conversations with the Barnharts in 2003 that he began thinking about establishing a non-union shop in Erie. Tr. 1312; 1319; 1327-28. In John Farrell's view, establishing a RCS branch to compete in Erie's non-union roofing market would benefit AWF and Local 210 by weakening the position of Alex Roofing and other non-union companies competing with union companies for built-up roofing and prevailing wage work. Tr. 1328; 1424-25.

26.     Brian Fenno, a long-time Barnhart employee, was present at one of the meetings between the Farrells and the Barnharts. John Farrell knew of Brian Fenno's good reputation in the roofing business, and asked him if he would be interested in running a RCS branch in Erie. Tr. 591–92; 1331-33. Mr. Fenno was considering other options at the time, and he told John Farrell that he would get back to him. Tr. 593; 1421.

27.     Mr. Fenno testified that he had several subsequent phone conversations with John Farrell about the job offer. He eventually agreed to meet with John Farrell at a Bob Evans restaurant in Erie to discuss pay, benefits, use of a vehicle, tools, hiring a crew, and other details. Shortly thereafter, In July 2004, Mr. Fenno accepted the job with RCS. Tr. 594-96; 1335-36; 1769-70.

28.     Mr. Fenno testified that when he went to work at RCS-Erie, he understood that he was going to report to the owner, Cathy Farrell. Tr. 640.

29.     After Mr. Fenno was hired, John Farrell provided him with a Dodge pick-up truck and cell phone, both of which were registered to AWF. Mr. Fenno used the truck and cell phone to recruit and hire his former crew from Barnhart Roofing to work for RCS. Tr. 595-96.

30.   Mr. Fenno identified Plaintiffs' Exhibit 29 as the first page of the orientation materials which he provided to the employees he hired for RCS.   He was given these materials by Karen Farrell (John's wife), who works part-time as an office administrator at the AWF–Erie location.  The following companies are listed on this document as "RoofUSA Service Centers:"

- AWF
- Roof Craft Systems
- Roofers Edge
- Carolina Roofing
- Classic Roofing
- Jameson Roofing
- Northwestern Roofing
- Progressive Roofing
- Progressive Services

31.   During his first six months of employment at RCS–Erie, Mr. Fenno was at the AWF–Erie facility on Schaper Avenue about once a week, and would often meet with John Farrell to discuss RCS–Erie's business.   After 2004, the amount of time Mr. Fenno spent at the Schaper Avenue facility decreased significantly.   Tr. 610-11; 1426.

32.   John Farrell testified that, during RCS–Erie's initial start-up period, there was an "overlap" of AWF personnel providing payroll services, employee training, and other administrative support for RCS–Erie.   Tr. 1345-50.

33.   In the summer and fall of 2004, John Farrell gave Mr. Fenno authorization to use AWF's Home Depot line of credit to purchase tools for RCS.   Tr. 600-01.

34.     In late 2004, John Farrell and Brian Fenno discussed the need for a building to serve as RCS-Erie's headquarters.  John Farrell suggested a building owned by Bill Farrell, located on Flower Road.  Using materials ordered from AWF's supplier, B&L Wholesale, RCS-Erie employees then spent approximately four weeks working on the building to make it serviceable.  RCS paid for the materials associated with restoring and remodeling the building, and did not charge Bill Farrell for the labor.  Tr. 612-14.

35.     John Farrell authorized the transfer of equipment from AWF-Erie's Schaper Avenue facility to RCS-Erie's Flower Road facility, including a roof cutter, a power broom, wheel barrows, flat carts, safety rails, traffic cones, scaffolding, leaf blowers, and a Rhino machine, which is a $9,000 piece of power equipment used for roof removal. Tr. 602-04. John Farrell testified that the main reason he authorized the transfer of this equipment from AWF's Schaper Avenue location to RCS-Erie's Flower Road location was to allow AWF-Erie to acquire a new equipment inventory. Tr. 1339.

36.     John Farrell also advised Brian Fenno to contact AWF-Erie if he needed materials and equipment delivered to RCS job sites.  Tr. 606.  On at least two occasions in April and May 2005 Mr. Fenno faxed supply lists to Will Davis at AWF-Erie for delivery of materials to RCS job sites.  See Plaintiffs' Exhibit 33.

37.     Since its establishment in 2004, RCS has engaged in commercial roofing work in the Erie PA area, consisting primarily of single-ply EPDM rubber installations.  Tr. 627-28.

38.     On several occasions in 2004 through 2006, AWF provided its crane truck and driver to handle roofing materials at RCS job sites.  Tr. 615-16.

39.     Brian Fenno testified that he has always had full autonomy with respect to hiring RCS-Erie employees, as well as determining their rates of pay, work schedules, raises, promotions, and time off.  He does not consult with anyone from AWF on any of these matters.  Mr. Fenno also deals with RCS-Erie customers, and decides which jobs to bid, the amount of each bid, and which jobs to take – all without consulting anyone from AWF.  Tr. 642–47.

## III.    The Collective Bargaining Agreement

40.     The CBA in effect from May 1, 2004 through April 30, 2009 defines the territorial jurisdiction of Local 210 as "comprised of Erie, Crawford, Venango, Warren, McKean and Potter Counties, Pennsylvania, and Chautauqua, Cattaraugus and Allegany Counties, New York …." Joint Exhibit 93, Bates #D3652-53.

41.     Article III of the 2004-09 CBA provides a detailed definition of the "Work Jurisdiction" covered by the agreement. *Id.* at Bates #D3653-54.  The built-up roofing and single-ply applications represented by Defendants' Exhibits A-D are encompassed by this definition.

42.     Articles XXIX and XXXI of the 2004-09 CBA set forth the respective rates of required employer contributions to Local 210's Health & Welfare and Money Purchase Funds, based on hours worked by covered employees within the defined territorial and work jurisdictions.  *Id.* at Bates #D3662-63.

43.     Article XXXIII of the 2004-09 CBA establishes the terms and procedures for required deduction and payment of work dues on behalf of covered employees.  *Id.* at Bates #D3664.

44.  Neither Bill Farrell nor John Farrell personally signed the 2004-09 CBA, or any of the collective bargaining agreements at issue.

## IV.  The Dispute

### A.  Rick Allen

45.  Rick Allen was employed by AWF-Erie as a salesman for approximately 3½ to 4 years, ending in August 2007.  Tr. 929.

46.  Mr. Allen testified that, at some point during his employment with AWF, he found out from John Farrell that Brian Fenno was operating RCS-Erie to service a market that AWF did not generally pursue.  Tr. 946–47.

47.  Mr. Allen testified that, after getting the "green light" from John Farrell to sell jobs for RCS, he met with Brian Fenno on several occasions at RCS-Erie's Flower Road facility to discuss procuring jobs for RCS.  Tr. 958–61.

48.  Mr. Allen's efforts on behalf of RCS proved successful; during 2005 alone, Mr. Allen generated $513,300 in sales for RCS, or 46.61% of total revenue during its first full year of operation.  Tr. 981-85; Joint Exhibits 4, 7.

49.  At some point in 2005, Rick Allen prepared a bid for AWF on a commercial roofing job for A.J. Scollo at the United Fruit Company facility located in a retail plaza on Peach Street in Erie.  Upon delivering the bid, Mr. Allen learned that McCreary Roofing – whose office and warehouse is located just down the street from the United Fruit facility – had submitted a lower bid on the job.  Mr. Allen testified that he knew RCS's non-union labor costs would be lower than the costs of labor for union roofers, so he went to see Brian Fenno to discuss putting together a bid for the job on behalf of RCS.  Tr. 963-72.

50. Mr. Allen and Brian Fenno went to the United Fruit facility to look at the job site, and soon thereafter RCS bid on the job. A.J. Scolio eventually accepted RCS's bid. Tr. 972-75.

51. The United Fruit job was within the scope of work covered by Article III of the CBA. Tr. 1380.

52. Soon after RCS was awarded the United Fruit job, John Farrell told Mr. Allen that Greg McCreary from McCreary Roofing was very upset about losing the bid to the Farrells' non-union shop. John Farrell, Rick Allen, and Greg McCreary subsequently met for lunch at the Zukor Club in Erie to discuss the matter. Tr. 976-78.

53. During the lunch at the Zukor Club, John Farrell told Greg McCreary that he was there to represent the interests of both AWF and RCS. He also told Mr. McCreary that if he really wanted the United Fruit job, he would tell Brian Fenno to just walk away. Mr. McCreary made a comment to the effect that he did not need John Farrell's help getting work. Mr. McCreary then got up and left the room. Tr. 1372-75.

54. RCS did the A.J. Scolio retail plaza job at the revised contract price of $108,950. Joint Exhibit 7.

**B.    Matt Gress**

55. Matt Gress was the business manager for Local 210 from 1983 until he retired in 2007. Tr. 254.

56. Mr. Gress testified that he became aware of the establishment of RCS-Erie when he received complaints from union members about non-union RCS employees coming and going from AWF-Erie's shop. Tr. 264-65.

57.     Around the time RCS-Erie was opening, Mr. Gress spoke with John Farrell about Farrell's plan to establish RCS-Erie as a non-union shop in order to divert work from Alex Roofing and other non-union competitors, which John Farrell believed would benefit Local 210 and the union roofing companies. Mr. Gress told Mr. Farrell that he was opposed to the idea because it would establish another non-union company in the already crowded Erie roofing market. Tr. 1424-25.

58.     Plaintiffs' Exhibits 2-4, 14 and 15 consist of photographs depicting RCS job sites in the Erie PA vicinity. Mr. Gress testified that these photographs were taken prior to June 2006.[4] Several of the photographs show vehicles and/or equipment marked "A.W. Farrell" or "AWF," or painted a color which Mr. Gress identified as "Farrell Blue." Tr. 274.

59.     Mr. Gress testified that he also had a lunch meeting with John Farrell and Greg McCreary at which they discussed the United Fruit job. Greg McCreary was upset because McCreary Roofing was the low bidder on the job, and John used his non-union company to cut the price and take the job, which was located just two blocks from the McCreary office and warehouse. John Farrell offered to withdraw the RCS bid, but Mr. McCreary said he would be uncomfortable with this because A.J. Scollo had already accepted the lower price. McCreary then got up and left the restaurant. Tr. 294-300.

60.     Mr. Gress testified that, prior to the establishment of RCS-Erie, he could not recall any grievances filed against AWF during the 24 years he served as business

---

[4] It was stipulated at trial that June 2006 was the month during which the National Labor Relations Board ("NLRB") conducted hearings on grievances filed (and later withdrawn) by Local 210 against AWF relating to the United Fruit job. Tr. 289. The transcript of the NLRB hearing testimony was used on occasion during the trial of this action to refresh the recollection of certain witnesses, but was not offered as evidence, and the matters pertaining to the proceedings before the NLRB have not otherwise been made part of the record for consideration by this Court as trier of fact.

manager, and he never had any reason to believe that AWF did anything to avoid its obligations under the CBA. Both Bill and John Farrell were supporters of Local 210, and hired many union workers. John Farrell was a long-time member of the Joint Apprentice Training Committee ("JATC"), which provided education and training to apprentice roofers with the goal of maintaining a skilled union workforce, and was a trustee of the Funds for many years as well. Tr. 303-05.

## C.    Jack Lee

61.    Plaintiff Jack Lee succeeded Matt Gress as business manager of Local 210 in 2007. He currently holds that position, and is also currently a trustee of Local 210's Money Purchase Pension Plan and Joint Health & Welfare Fund. Tr. 676-77.

62.    Prior to 2007, Mr. Lee was an employee of AWF-Erie for 24 years. During that time, he was a member of Local 210's executive board, and was actively involved with the collective bargaining between the union and the Erie Construction Council. Tr. 679-88.

63.    Mr. Lee testified that at some point in 2005, while he was still employed by AWF-Erie, he became aware of allegations by Local 210 members that John Farrell was operating RCS-Erie as a non-union shop. Mr. Lee testified that, in the summer months of 2006, he went to several RCS job sites and took photographs, which he provided to Matt Gress and to plaintiffs' counsel. Tr. 691-92.

64.    Plaintiffs' Exhibit 1 is a series of 12 photographs, identified in Mr. Lee's handwriting as RCS's job site at Eastway Bowling. Depicted in these photographs are trailers, safety rails, and wheelbarrows painted "Farrell Blue" and gang boxes, tools, and

-17-

other implements identified by the letters "AWF," or otherwise identified by Mr. Lee as belonging to AWF. The photographs also depict the roof installation itself, identified by Mr. Lee as commercial single-ply rubber roofing work covered by the CBA. Tr. 692-700.

65. Plaintiffs' Exhibits 2-13, 16-18, and 20-22 contain multiple photographs taken by Mr. Lee[5] depicting various job sites in the Erie vicinity at which RCS performed commercial roofing work covered by the CBA during the years 2005-2010. Several of the photographs show vehicles and/or equipment marked "A.W. Farrell" or "AWF," painted "Farrell Blue," or otherwise identified by Mr. Lee as belonging to AWF. Tr. 703-58.

## CONCLUSIONS OF LAW

Plaintiffs seek to impose the obligations set forth in the collective bargaining agreements regarding employer contributions to the Funds and payment of union work dues based on hours worked by employees of non-signatory RCS within the defined territorial and work jurisdictions, pursuant to the following three theories:

I.  AWF and RCS represent a "single employer" comprising an appropriate collective bargaining unit, binding non-signatory RCS to the terms of the CBAs between AWF and Local 210.

II. RCS is bound by the terms of the CBAs an "alter-ego" of AWF.

III. Bill Farrell and John Farrell are "controlling officers" of AWF whose conduct in establishing RCS rose to the level of fraud, thereby warranting the

---

[5] Matt Gress testified at trial that he (not Jack Lee) took the photographs admitted into evidence as Plaintiffs' Exhibits 2, 3 and 4.

imposition of personal liability for RCS's and AWF's obligations under the CBAs.

Each of these theories is addressed in turn.

## I. Single Employer Doctrine

1. A company that is not a party to a CBA may be held liable for the obligations of a company that is a party to the CBA if (1) the two companies are, in fact, a "single employer," or "part of a single integrated enterprise ...," and (2) together they represent an appropriate employee bargaining unit. *Lihli Fashions Corp., Inc. v. NLRB*, 80 F.3d 743, 747–48 (2d Cir. 1996) (citing *Clinton's Ditch Coop. Co. v. NLRB*, 778 F.2d 132, 137 (2d Cir. 1985), *cert. denied*, 479 U.S. 814 (1986)); *see also Brown v. Sandimo Materials*, 250 F.3d 120, 129 n. 2 (2d Cir. 2001); *LaBarbera v. C. Volante Corp.*, 164 F. Supp. 2d 321, 325-26 (E.D.N.Y. 2001).

2. In the first step of this inquiry, courts employ a four-factor test to determine single employer status, examining "interrelation of operations, common management, centralized control of labor relations and common ownership." *Radio & Television Broad. Technicians Local Union 1264 v. Broad. Serv. of Mobile, Inc.*, 380 U.S. 255, 256 (1965) (per curiam). "Also relevant are the use of common office facilities and equipment and family connections between or among the various enterprises." *Lihli Fashions*, 80 F.3d at 747. "Although no one factor is determinative, and, indeed, all four factors are not required, control of labor relations is the central concern." *Murray v. Miner*, 74 F.3d 402, 404-05 (2d Cir. 1996) (citations omitted); *see also Parker v. Columbia Pictures Industries*, 204 F.3d 326, 341 (2d Cir. 2000) ("A crucial element of the inquiry focuses on whether the

two enterprises exhibit centralized control of labor relations, including tasks such as handling job applications, approving personnel status reports, and exercising veto power over major employer decisions.").

3.    The Second Circuit in *Murray* also cautioned that, in conducting the "single employer" inquiry, courts must remain mindful of the doctrine of limited liability, which "allows a corporation to organize so as to isolate liabilities among separate entities." *Id.* at 404. This doctrine "creates a strong presumption that a parent company is not the employer of its subsidiary's employees, and the courts have found otherwise only in extraordinary circumstances." *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1362 (10th Cir. 1993) (citing *Johnson v. Flowers Indus., Inc.*, 814 F.2d 978, 980-81 (4th Cir. 1987)). "Ultimately, single employer status depends on all the circumstances of the case and is characterized by absence of an arm's length relationship found among unintegrated companies." *NLRB v. Al Bryant, Inc.*, 711 F.2d 543, 551 (3d Cir. 1983), *cert. denied*, 464 U.S. 1039 (1984) (internal quotation marks and citation omitted), *quoted in Lihli Fashions*, 80 F.3d at 747.

## A.    Interrelation of Operations

4.    Courts in the Second Circuit have used the following criteria in analyzing the interrelation of operations between separate corporate entities for the purpose of determining single employer status: (1) involvement in daily production, distribution, marketing, and advertising decisions; (2) sharing of employees, services, records, and equipment; (3) commingling of bank accounts, inventories, and lines of credit; (4) maintenance of corporate records; and (5) preparing and filing of tax returns.    See

*Ferguson v. New Venture Gear, Inc.*, 2009 WL 2823892, at *2 (N.D.N.Y. Aug. 31, 2009) (applying "single employer" doctrine to assess liability for employment discrimination under Title VII); *see also Meng v. Ipanema Shoe Corp.*, 73 F. Supp. 2d 392, 402-03 (S.D.N.Y. 1999) (same).

5. As set forth above in the Findings of Fact, the evidence presented at trial establishes that John Farrell, manager of AWF's Erie location, was responsible for setting up the RCS location in Erie, and hired Brian Fenno to manage the RCS-Erie branch.

6. During RCS-Erie's initial start-up period, Mr. Fenno regularly consulted with John Farrell about the Farrell Companies' organizational procedures, procurement of vehicles and equipment, and other business matters, but these meetings decreased significantly following the establishment of RCS-Erie's headquarters at the Flower Road facility.

7. At all times relevant to this litigation, the daily operations of RCS-Erie have been controlled entirely by Brian Fenno.

8. The initial customers of RCS-Erie were acquired by Mr. Fenno directly, based on prior business relationships acquired through his employment with Barnhart Construction. Following this initial marketing effort, AWF's salesman Rick Allen worked with Brian Fenno to develop bids and solicit jobs for RCS-Erie, including the A.J. Scolio/United Fruit job. Mr. Allen was ultimately responsible for job sales generating nearly half of RCS-Erie's revenue during its first full year of operation.

9. Brian Fenno decides which jobs to bid, the amount of each bid, and whether to take the job; deals with the customers; makes adjustments on contract prices; orders

materials; supervises the work; handles on-site problems; and does the final inspection of RCS-Erie jobs, all without input from AWF.

10.    Many of the administrative functions of RCS-Erie are handled by the same personnel who perform those functions for AWF at the corporate offices located at 3761 East Lake Road, Dunkirk. Those offices function as the headquarters for each of the Eastern Companies, including RCS.

11.    Since the only employees hired directly by RCS-Erie are the roofers themselves, RCS-Erie depends on AWF employees for essentially all of its administrative needs. For example, as CFO for the Eastern Companies during the relevant time period, John Bauer oversaw RCS' banking, insurance, and accounting functions, with administrative support from AWF employees at Dunkirk. AWF employees also provide human resources services, contract administration, vehicle registration, and safety training for RCS.

12.    The costs for these services are allocated pro rata among the companies on whose behalf the services were performed, resulting in savings based on economies of scale. Under these circumstances, where the recipient of the services paid for them in the same manner as if they had been furnished by an outside provider, courts have been reluctant to find related companies' shared administrative services as sufficient evidence of interrelated operations to impose single employer status. *See, e.g., Herman v. Blockbuster Entertainment Group*, 18 F. Supp. 2d 304, 310 (S.D.N.Y. 1998) (no finding of interrelated operations where related companies each paid for shared payroll processing, tax return preparation, insurance claim processing, computer operation work, and legal services provided under a management services agreement), *aff'd*, 182 F.3d

899 (2d Cir.), *cert. denied*, 528 U.S. 1020 (1999); *Velez v. Novartis Pharmaceuticals Corp.*, 244 F.R.D. 243, 253 (S.D.N.Y. 2007) ("If such routine connections among corporate affiliates necessitated a finding of interrelated operations, most large corporate families would count as single enterprises ....").

13.     During the early period of RCS-Erie's operations, John Farrell authorized the transfer of used vehicles and equipment from AWF-Erie to RCS-Erie. However, the evidence indicates that this was done to allow AWF-Erie to update its inventory, and to facilitate RCS-Erie's start-up and initial operations which consisted largely of completing work for former customers of Barnhart Construction.

14.     The preponderance of the evidence also indicates that the used equipment received from AWF became part of RCS-Erie's inventory, and RCS-Erie subsequently acquired its own inventory of vehicles and roofing equipment. See, e.g., Joint Exhibit 83; Tr. 666, 669.     There is no showing that AWF and RCS alternately used the same equipment, treated equipment as interchangeable between the two companies, or "used the same personnel and equipment to provide the same services to the same customers." *Duffy v. Modern Waste Services Corp.*, 2011 WL 573564, at *5 (E.D.N.Y. Feb. 14, 2011).

15.     The proof at trial further establishes that the commercial roofing services provided by RCS and AWF to their customers in Erie are not functionally integrated or substantially identical. RCS-Erie primarily installs and repairs single-ply EPDM rubber roofs on private commercial properties, while the services provided by AWF-Erie primarily involve built-up roof installations on prevailing wage jobs. RCS-Erie has never bid prevailing wage work, has never done built-up roofing, and does not have the specialized equipment required to perform that work.

16. The proof also shows that non-union crane truck drivers employed by AWF-Erie occasionally performed work at RCS-Erie job sites. Specifically, Robert Staszewski testified that he made deliveries of material and equipment to RCS-Erie job sites at the direction of John Farrell, but these deliveries began to decline in approximately 2005. Tr. 393-94; 400-02. Jamie Kesseling testified that he made deliveries to RCS-Erie job sites, but could recall only two such deliveries. Tr. 519-20. Brian Fenno also testified that AWF-Erie employees Ed Munson and Terry Bland made deliveries to RCS-Erie job sites in 2004 and 2005. Tr. 605-06.

17. Taken as a whole, this evidence does not weigh significantly in favor of a finding that the operations of AWF and RCS are sufficiently interrelated to impose single employer status.

## B. Centralized Control of Labor Relations

18. To determine whether two related companies maintain centralized control over labor relations, courts look to the following factors:

[W]hether the companies have separate human resources departments and whether the entity establishes its own policies and makes its own decisions as to the hiring, discipline, and termination of its employees. Other relevant factors include whether employment applications are sent to the other entity, whether the other entity must clear all major employment decisions, and whether the entities shift employees back and forth.

*Finkel v. Frattarelli Bros., Inc.*, 2008 WL 2483291, at *11 (E.D.N.Y. June 17, 2008) (internal quotation marks, alterations and citations omitted); *see also Ferguson v. New Venture Gear, Inc.*, 2009 WL 2823892, at *3 (N.D.N.Y. Aug. 31, 2009).

19. As set forth above in the Court's Findings of Fact, the evidence presented at trial reveals that Brian Fenno hires the employees for RCS-Erie, and has done so since

the establishment of the branch. He also determines the rates of pay, work schedules, job duties, raises and promotions, and vacation time for all RCS-Erie employees, without consulting John Farrell – or anyone at AWF – on any of these matters.

20. Mr. Fenno has also fired employees at RCS-Erie without checking with or reporting to AWF.

21. Human resource services for RCS employees, and for all non-union Farrell Company employees, are provided by personnel at the AWF-Dunkirk facility. Human resource services for AWF's union employees are provided through the union.

22. There is no evidence of any shifting of employees back and forth between AWF-Erie and RCS-Erie.

23. There is likewise no evidence that AWF and RCS "appear to make joint hiring and firing decisions …." *Lihli Fashions Corp.*, 80 F.3d at 747, "[n]or is there evidence from which a reasonable factfinder could conclude that [AWF] exerted control over the conditions of employment at [RCS]." *Velez*, 244 F.R.D. at 252. Rather, the evidence strongly suggests that Brian Fenno maintains control over labor-related tasks "such as handling job applications, approving personnel status reports, and exercising veto power over major employer decisions." *Parker*, 204 F.3d at 341.

24. Accordingly, consideration of the evidence relating to centralized control of labor relations does not weigh significantly in favor of a finding of single employer status.

## C. Common Management/Ownership

25. Common management and common ownership, the last two prongs of the single employer test, are generally accorded less weight by courts conducting the "single

employer" analysis. *Finkel*, 2008 WL 2483291, at *12, *Laurin v. Pokoik*, 2004 WL 513999, at *8 (S.D.N.Y. Mar. 15, 2004).

26.     RCS is owned by Cathy Farrell (51%) and Mark Farrell (49%). AWF is owned by Bill Farrell (100%). Each company is a "Subchapter S" corporation, not subject to federal income taxes as a corporate entity. *See* 26 U.S.C. §1363(a). Under Subchapter S, the income or losses of each company are "passed through" to the shareholders on a pro rata basis, and are reported on their individual federal tax returns. *See* 26 U.S.C. § 1366(a), (b).

27.     Although Bill Farrell provided Mark and Cathy Farrell the funding to purchase RCS as a function of family estate planning, and does not charge RCS-Erie rent for use of the Flower Road facility, this does not constitute the type of evidence that courts have found sufficient to establish "overlapping" family ownership and control for the purpose of imposing single employer liability. *Lihli Fashions*, 80 F.3d at 747 (two related companies, one owned by mother of children who owned second company, found to have common ownership and control where, *inter alia*, mother served as president and exercised ultimate business and artistic control over both entities); *see also Bourgal v. Robco Contr. Enterprises, Ltd.*, 969 F. Supp. 854 (E.D.N.Y. 1997), *aff'd*, 182 F.3d 898 (2d Cir. 1999) (common ownership, management and supervision of three related companies owned by husband and wife found where husband controlled day-to-day operations and made employment decisions for all three companies).

28.     As to management, the proof presented at trial establishes that the commercial roofing business of RCS-Erie has at all times been under the sole

management of Brian Fenno, who retains control over labor relations and conducts day-to-day operations independently of the day-to-day roofing business of AWF.

29.     As set forth above, while John Bauer provides oversight with respect to RCS-Erie's banking, insurance, and accounting needs, he does so for all the Eastern Companies, and the costs of his services – as well as the cost of all shared administrative services – are carefully allocated in order to achieve savings based on economies of scale. This provides strong evidence of an arm's length relationship between and among the Farrell Companies.

30.     Beyond the weekly consultations between Brian Fenno and John Farrell during the initial period of RCS-Erie's operations, there is no evidence of any activity that could be termed "common management" of the roofing businesses conducted by RCS and AWF.

29.     Based on this analysis, the Court finds insufficient evidence to establish that AWF and RCS are a single employer, or part of an integrated single enterprise, for the purpose of holding RCS liable for the contribution obligations set forth in the CBA between Local 210 and the Erie Construction Council. Accordingly, the Court need not engage in the second prong of the single employer inquiry – i.e., whether the employees of AWF and RCS together constitute a single appropriate bargaining unit.

## II.     Alter Ego Doctrine

30.     The alter ego doctrine provides an alternative "analytical hook to bind a non-signatory to a collective bargaining agreement." *Truck Drivers Local Union No. 807 v. Regional Import & Export Trucking Co.*, 944 F.2d 1037, 1046 (2d Cir. 1991). "The

hallmarks of the alter ego doctrine include 'whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership.' " *Id.* at 1046 (quoting *Goodman Piping Products, Inc. v. NLRB*, 741 F.2d 10, 11 (2d Cir. 1984)).

31.     As explained by the Second Circuit:

> While the alter ego doctrine has the same binding effect on a non-signatory as the single employer/single unit doctrine, the two doctrines are conceptually distinct. The focus of the alter ego doctrine, unlike that of the single employer doctrine, is on the existence of a disguised continuance or an attempt to avoid the obligations of a collective bargaining agreement through a sham transaction or technical change in operations.

*Lihli Fashions*, 80 F.3d at 748 (internal quotation marks and citations omitted). Thus, while the "single employer" and "alter ego" doctrines share common elements, "the alter ego test is notably different than the 'four-factor' single employer test .…" *Id.*

32.     Additionally, although courts have found a showing of "anti-union animus or an intent to evade union obligations" to be a "germane" or "sufficient basis for imposing alter ego status," it is not a necessary factor. *Retirement Plan of UNITE HERE Nat. Retirement Fund v. Kombassan Holding A.S.*, 629 F.3d 282, 288 (2d Cir. 2010); *see also Goodman Piping*, 741 F.2d at 11.

33.     As indicated by the Court's analysis of the single employer factors, the evidence presented at trial shows that AWF and RCS do not have substantially identical management. The business of RCS-Erie has at all times been under the management of Brian Fenno. Apart from the limited business advice and operational support provided by John Farrell and AWF-Erie during RCS-Erie's early stages, Mr. Fenno did not consult with

or receive any substantial managerial direction from any employee of AWF with respect to the operations of RCS-Erie.

33. The proof also shows that AWF and RCS do not have an identical business purpose in the Erie or Dunkirk markets. AWF derives a substantial portion of its income from installation and repair of multi-layered built-up roofing under contracts subject to prevailing wage requirements. RCS has never sought or performed such work in Erie.

34. Likewise, the operations of AWF-Erie and RCS-Erie are not substantially identical. The operations of AWF-Erie, directed by John Farrell during the time period relevant to this case, focus on prevailing wage work and built-up roofing. The operations of RCS-Erie, directed by Brian Fenno, focus on private commercial installations of single-ply EPDM roofing.

35. AWF-Erie and RCS-Erie do not share equipment. AWF transferred vehicles, equipment, and materials to RCS-Erie to facilitate start-up and initial operations, but there has been no showing of alternate use or interchange of this equipment between the two companies. Rather, the evidence shows that once this transfer of inventory was complete, it became the property of RCS-Erie, and RCS-Erie thereafter independently acquired its own inventory of equipment.

36. AWF and RCS do not share the same customer base. The initial customers of RCS-Erie were businesses with which Brian Fenno was familiar as an employee of Barnhart Construction. Work for subsequent customers has consisted primarily of EPDM installations and re-roofing. The majority of AWF-Erie's work involves built-up roofing installations for customers subject to prevailing wage requirements, which is a customer base RCS-Erie does not service.

37.     As further indicated by the Court's factual findings and analysis set forth above, AWF-Erie and RCS-Erie maintain entirely separate ownership and supervision of their employees.  *Cf. Armen Digital Graphics, Ltd. v. Amalgamated Lithographers, Local One*, 1997 WL 458738, at *7 n. 9 (S.D.N.Y. Aug. 12, 1997) ("Were courts to assume alter ego status merely from the closely held ownership of two companies by members of the same immediate family, families would be effectively precluded from organizing their business affairs in any but a single corporate entity.  Children would be barred from creating companies distinct from those owned by their parents.  The alter ego doctrine does not compel these results.").

38.     Significantly, no evidence was presented at trial to support the conclusion that RCS-Erie was established as a "disguised continuance" or "sham transaction" designed as an attempt to avoid the obligations of the CBA, or as a manifestation of anti-union animus.  To the contrary, the evidence before the Court suggests that John Farrell, a career-long union roofer and active Local 210 supporter, conceived and established RCS-Erie as a competitor for non-union commercial roofing work in the Erie PA market in order to weaken the competitive position of Alex Roofing and other non-union shops that were winning bids on work traditionally performed by union companies — *i.e.*, built-up roofing and prevailing wage work.  Understandably, Local 210 leadership did not share Mr. Farrell's view that bringing another non-union shop into an already competitive market would somehow result in more work for union roofers.  This set the stage for the conflict which developed when RCS-Erie outbid McCreary Roofing (owned by plaintiff Geoffrey McCreary, a trustee of the Funds ) on a job covered by the CBA and located just down the street from McCreary's union shop.

-30-

39.    In this Court's view as the trier of fact, when considered along with the totality of the circumstances presented by way of the testimony and documentary evidence at trial, these circumstances – while unfortunate – are not so "extraordinary" as to overcome the strong presumption of limited liability accorded by the law to properly established and properly maintained separate corporate entities.

40.    Accordingly, the Court finds that plaintiffs have failed to establish by a preponderance of the evidence that RCS is the alter ego of AWF, or that AWF and RCS constitute a single employer or a single integrated enterprise, so as to hold RCS liable for AWF's contribution obligations under the CBAs between Local 210 and the signatory members of the Erie Construction Council of Erie, Pa.

## III.    Personal Liability

41.    ERISA section 515 imposes a statutory obligation to make contributions to employee benefit funds on "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement . . . ." 29 U.S.C. § 1145.

42.    Generally, an individual corporate officer will not be held personally liable for the corporation's collective bargaining obligations "solely by virtue of his role as officer, shareholder, or manager". *Sasso v. Cervoni*, 985 F.2d 49, 50 (2d Cir.), *cert. denied*, 508 U.S. 973 (1993).    However, the Second Circuit has held that in "extraordinary cases" an individual corporate officer who did not sign the collective bargaining agreement in an individual capacity may nonetheless be held personally liable for the corporation's delinquent ERISA contributions where that individual "has committed fraud . . . or acted in

concert with a fiduciary to breach a fiduciary obligation ...." *Cement and Concrete Workers Dist. Council Welfare Fund, Pension Fund, Legal Services Fund and Annuity Fund v. Lollo*, 35 F.3d 29, 36 (2d Cir. 1994) (citing *Leddy v. Standard Drywall, Inc.*, 875 F.2d 383, 387-88 (2d Cir. 1989) (corporate officer convicted of criminal conspiracy to defraud the funds held liable for ERISA obligations) and *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 280 (2d Cir. 1992) (parties who knowingly participate in fiduciary breaches may be liable under ERISA to the same extent as the fiduciaries), *abrogated on other grounds by Gerosa v. Savasta & Co.*, 329 F.3d 317, 322-23, 327-28 (2d Cir.), *cert. denied*, 540 U.S. 967 (2003)).

43.     *Lollo* established a two-step inquiry to determine whether a corporate official should be held personally liable for fraudulent conduct. First, the trier of fact must determine whether the individual is a "controlling corporate official" by "examin[ing] the officer's actual role in the company's affairs and relationship to the company's wrongdoing." *Lollo*, 35 F.3d at 33. Second, the trier of fact must determine whether plaintiffs have established the common law elements of fraud, which include (1) a material false representation or omission of an existing fact, (2) knowledge of its falsity, (3) intent to defraud, (4) reasonable reliance, and (5) damages. *Lollo*, 35 F.3d at 33; *see also Finkel*, 2008 WL 2483291, at *13.

44.     In this case, it is not disputed that Bill and John Farrell are controlling corporate officials of AWF.

45.     Plaintiffs contend that Bill and John Farrell should be held personally liable for the contribution obligations under the CBAs because of their fraudulent conduct in establishing and operating RCS as an "alter ego" of AWF. However, as set forth above,

the Court has found the proof presented at trial insufficient to impose "alter ego" or "single employer" liability on the corporate defendants. It follows that, in the absence of a finding that RCS is bound by the contribution obligations of the CBA, no rational trier of fact could conclude that either Bill or John Farrell acted with the intent to defraud, or acted in concert with anyone to avoid any collective bargaining obligations, with respect to the establishment and operation of RCS-Erie.

46.    In addition, both the former and current business managers of Local 210 testified at trial that they had no knowledge or information regarding any fraudulent conduct, or any concerted action to avoid CBA obligations, on the part of either Bill or John Farrell.

47.    Accordingly, the Court finds that plaintiffs have failed to establish by a preponderance of the evidence that either Bill or John Farrell should be held personally liable for any contribution obligations under the CBAs at issue.

## CONCLUSION

Based on the foregoing, and for the reasons stated, the complaint in this action is dismissed in its entirety. The Clerk of the Court is directed to enter judgment in favor of defendants, pursuant to Fed. R. Civ. P. 58.

So Ordered.

Dated:    Buffalo, New York
          September 26, 2012

Honorable H. Kenneth Schroeder
United States Magistrate Judge

-33-